IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION _____/ | No. M 07-1827 SI<br>MDL No. 1827 |
| This Order Relates To: | No. C 11-4119 SI |
| P.C. RICHARD & SON LONG ISLAND CORPORATION, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>AU OPTRONICS CORPORATION, *et al.*,<br><br>Defendants.<br>_____/ | **ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF MARTA'S LACK OF STANDING UNDER *ILLINOIS BRICK*** |

Currently before the Court is defendants' joint motion for summary judgment on the federal damages claims of plaintiff MARTA Cooperative of America, Inc. ("MARTA"). Pursuant to Civil Local Rule 7-1(b), the Court finds this matter suitable for disposition without oral argument and therefore VACATES the hearing currently scheduled for September 12, 2014. Having considered the parties' papers, and for good cause appearing, the Court hereby DENIES defendants' motion.

**BACKGROUND**

Throughout the relevant period, MARTA was a Michigan corporation. MARTA's business was to provide its shareholders with a means of purchasing electronics and appliances. Declaration of Melissa Felder Zappala ("Zappala Decl.") Ex. B. MARTA acted as a non-exclusive purchasing agent for its members. *Id.* Its members placed orders with MARTA, and MARTA in turn negotiated the sales

of the requested merchandise from manufacturers. *Id.* If MARTA was able to complete the purchase, it was required to resell the merchandise to the requesting member. *Id.* However, if the order could not be completed without a reasonable variance, the obligation to purchase and resell was voided. *Id.* MARTA also organized trade shows to assist its members in understanding the landscape of electronics sales. *Id.* Ex. E.

Before purchasing products from manufacturers, MARTA negotiated deals referred to as "programs." *Id.* Ex. C. These "programs" comprised a number of different elements such as volume rebates, advertising terms, promotional allowances, and various discounts. *Id.* Exs. A, C. MARTA then purchased the products and paid the vendors. *Id.* Exs. A, C. Then MARTA shipped the products to the requesting member, and billed the member. *Id.* Ex. C. Although MARTA's members participated in committees that functioned to provide input to MARTA's Executive Director regarding programs in which they were interested, the Executive Director was ultimately responsible for negotiating with the manufacturers. *Id.* Ex. A.

The amount that MARTA charged its various members was not constant. *Id.* Ex. V. MARTA used various factors to determine what a member's price would be, including market conditions, shopping reports, how price sensitive the product was, and whether the product was "core" – that is, a product that MARTA considered to be more competitive and thus more important for a member to stock. *Id.* Exs. C, V, Q.

Although MARTA was a not-for-profit entity, its sales to members generated revenue that was used in numerous ways. *Id.* Ex. A. For example, MARTA sometimes sold its members "core" products at a loss, and used revenue derived from above-cost sales to recoup those losses. *Id.* Ex. C. MARTA also used revenue from above-cost sales to maintain its premises and pay its staff. *Id.* Ex. A.

During the relevant period, MARTA's membership was constantly in flux, but included many members, predominantly electronics and appliance retailers. *Id.* Ex. B. Every MARTA member was also a shareholder, with each owning 4,000 shares, with a total value of $4,000. *Id.* Ex. I. Each member additionally paid annual dues of $6,000. *Id.* Ex. J.

Although all of MARTA's members owned stock in the entity, its business and affairs were managed not by the membership at large, but by a twelve-person Board of Directors. *Id.* Ex. B.

2

MARTA also had elected officers – including a President, Vice-President, Secretary, and Treasurer – in addition to its Executive Director and a number of employees responsible for overseeing day-to-day activities. *Id.*

Defendants now move for summary judgment on MARTA's federal damages claims, arguing that MARTA lacks standing under *Illinois Brick* because it was wholly owned and controlled by its members.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the nonmoving party to "set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex*, 477 U.S. at 324). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id.* However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise

genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c)(2).

**DISCUSSION**

Defendants move for summary judgment on MARTA's federal claims, arguing that, under the ownership and control exception in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), MARTA lacks standing. The Court disagrees.

The ownership and control exception to the *Illinois Brick* bar against standing for indirect purchasers encompasses relationships involving "such functional economic or other unity between the direct purchaser and either the defendant or the indirect purchaser, that there effectively has been only one sale." *Sun Microsystems, Inc. v. Hynix Semiconductor Inc.*, 608 F. Supp. 2d 1166, 1180 (N.D. Cal. 2009); *see also Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323, 326-27 (9th Cir. 1980); *Jewish Hosp. Ass'n v. Stewart Mech. Enters.*, 628 F.2d 971, 975 (6th Cir. 1980); *In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d 355, 365 (D.N.J. 2001) ("[T]he rationale of *Illinois Brick*'s bar to indirect purchaser suits does not apply where the supposed intermediary is controlled by one or the other of the parties"). The Ninth Circuit has addressed the ownership and control exception in the context of the relationship between direct purchasers and defendants/co-conspirators. *See In re ATM Fee Antitrust Litig.*, 686 F.3d 741 (9th Cir. 2012). The court explained that "control" means "to exercise restraint or direction over; dominate, regulate, or command," or to have "the power or authority to guide or manage." *Id.* at 757 (internal citations omitted). "[S]ituations where an ownership or control relationship between an indirect purchaser and a direct purchaser" may exist include parent-subsidiary relationships or one company's stock ownership of another. *Jewish Hosp. Ass'n*, 628 F.2d at 975.

However, the Ninth Circuit does not analyze "control" simply in terms of the quantity of stock owned, and has held that mere "input on policies and pricing issues by interested members does not constitute the type of control necessary to meet the exception to *Illinois Brick*." *ATM Fee*, 686 F.3d at 758; *see also In re Lithium Ion Batteries Antitrust Litig.*, 13-MD-2420 YGR, 2014 WL 309192, at *6 (N.D. Cal. Jan. 21, 2014) ("Minority stock ownership is not by itself sufficient to satisfy *Royal Printing* and its progeny. Rather, the gravamen of the inquiry is control.").

4

In *ATM Fee*, the Ninth Circuit held that minority stock ownership, which amounted to approximately ten percent, was insufficient to establish ownership and control. 686 F.3d at 757. In addition to the quantity of stock owned, the court also considered the alleged coconspirators' ability to set prices and control the board of the allegedly controlled entity. *Id.* at 758. Other courts have considered additional factors that may also be relevant to the control issue. *See Sun Microsystems*, 608 F. Supp. 2d at 1180 ("Some examples of the types of facts that would satisfy the control exception have furthermore been defined as: 'interlocking directorates, minority stock ownership, loan agreements that subject the wholesalers to the manufacturers' operating control, trust agreements, or other modes of control separate from ownership of a majority of the wholesalers' common stock.'") (quoting *In re Brand Name Prescription Drugs Antitrust Litig.,* 123 F.3d 599, 606 (7th Cir. 1997)).

The Court finds that MARTA was the direct purchaser in this instance, and that the ownership and control exception does not apply to its members. Previously in this MDL, the Court agreed with counsel for the DPP class that one of MARTA's former members was not a direct purchaser because it did not purchase any products directly from any defendant, subsidiary, affiliate, or named coconspirator. *See* MDL Master Dkt. Nos. 8525, 8585. Although MARTA opted out of the DPP class on behalf of itself and its members, logic commands the conclusion that MARTA – and not its members – was the direct purchaser in these transactions. *See id.*

Furthermore, the Court is satisfied that MARTA's members did not exercise such control over it that the exception to *Illinois Brick* should apply to them. Although each of MARTA's members owned stock in the entity, the individual amounts that each member owned were *de minimis*, worth a mere $4,000. *See ATM Fee*, 686 F.3d at 757 (considering that an entity's stock was "widely dispersed" when evaluating the ownership and control exception). Nor did MARTA's members exercise such control over the entity that they should properly be considered direct purchasers. MARTA's members participated in committees that then made suggestions to the Executive Director, but it was the Executive Director who ultimately negotiated for the programs. Although MARTA was bound to sell the purchased products and the members were bound to buy them, MARTA independently calculated and set the resale price. Additionally, MARTA was run not by its members, but by its Board of Directors. Based upon the evidence now before it, the Court cannot say that there was "such functional

economic or other unity between the direct purchaser and . . . the indirect purchaser, that there effectively has been only one sale." *See Sun Microsystems*, 608 F. Supp. 2d at 1180.

Accordingly, the Court finds that MARTA, and not its members, was the direct purchaser of the allegedly price-fixed products, and therefore DENIES defendants' motion for summary judgment.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby DENIES defendants' motion for summary judgment. This Order resolves MDL Master Docket No. 9060.

**IT IS SO ORDERED.**

Dated: September 4, 2014

SUSAN ILLSTON
UNITED STATES DISTRICT JUDGE